**UNITED STATES of America**

v.

**Deborah E. MORRIS, Appellant.**

**UNITED STATES of America**

v.

**Rufus S. McDOWNEY, Appellant.**

**Nos. 86–3095, 87–3010.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 9, 1987.

Decided Jan. 15, 1988.

---

Thomas Lumbard, (Appointed by this Court), for appellants.

Silvia L. Gonzalez, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., were on the brief for appellee.

Before EDWARDS, SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Defendants Deborah Morris and Rufus McDowney appeal from a judgment entered in the district court after a jury trial in which they were convicted of conspiring to distribute and possess with intent to distribute phencyclidine ("PCP") in violation of the Controlled Substances Act, 21 U.S.C. § 846 (1982). Because there was insufficient evidence for the jury to find an agreement between Morris and McDowney to distribute PCP, we must reverse the conspiracy convictions. Morris also challenges one of her four convictions for distribution of PCP in violation of 21 U.S.C. § 841(a)(1) (1982), but we believe this appeal is without merit and we thus affirm the district court's judgment.

This case involves a short-lived business relationship between Detective Harvey Norris, an undercover police officer posing as a drug dealer, Deborah Morris, who sold PCP to Detective Norris, and Rufus McDowney, her alleged supplier. In May 1986, Detective Norris placed several orders for liquid PCP, which Morris bought for him in the vicinity of 7th and T Streets in Northwest Washington, D.C.—known widely at the time as an open-air drug market. There, Morris made contact on at least three occasions with one of the market's alleged vendors, Rufus McDowney. The central question in this appeal is whether the jury could have concluded beyond a reasonable doubt that the relationship between Morris and McDowney was more than simply one of buyer and seller, *i.e.*, that they were co-conspirators.

The first order for PCP was placed on May 9 when a government informant introduced Detective Norris to Deborah Morris, a suspected drug dealer. At this meeting, in Morris' house, the Detective arranged for the purchase of one ounce of liquid PCP. Since Morris did not have a sufficient supply of PCP at her home, the three drove to 6th and T Streets, where, Morris promised, she could fill the order. When they arrived, Morris got out of the car with $400 the detective gave her, briefly visited a local pool hall, and then made contact with an *unidentified* male in a nearby alley. Waiting in the car, the detective observed Morris give money to the man and receive an object in exchange. Morris returned to the car and gave Norris a one-ounce bottle of liquid PCP. Based on this

transaction, Morris was charged with and convicted of distributing PCP.

The next contact was on May 13, when Detective Norris and Morris bargained for the sale of three ounces of liquid PCP. As the Detective remembered the conversation, Morris promised to procure the PCP the next day (May 14th) "after 3:00 o'clock" when "her people with the good juice [liquid PCP] ... would be out." At Detective Norris' suggestion, the two planned to divide the drug purchases and deliveries into multiple parts. Detective Norris was unwilling to give Morris the entire $1200 for three ounces because the Drug Enforcement Administration had not authorized Norris to front such a large amount all at once. Morris, on the other hand, had to pay cash to the sellers because, according to Detective Norris' testimony, Morris explained that she had not "dealt with these people very long and they won't trust me to bring the stuff home here."

The actual sales on the 14th occurred in two parts, not three as planned. After 5:30 p.m., Norris came to Morris' house, gave her $400, and Morris left for 7th and T to fill the order. After her arrival in the area, Morris was observed by police officers with Rufus McDowney; the two walked a few blocks to Florida Avenue before separating. At 6:20 p.m., Morris returned to her house and presented the PCP to Norris, who was waiting there for the delivery. Satisfied with the first stage of the transaction, Detective Norris gave Morris the balance of the cash ($800) to purchase the other two ounces of PCP in one more step. Morris returned to 7th and T around 7:00 p.m. and waited at the corner. McDowney approached, and the two walked west to 9th Street and then headed north. They soon separated, and Morris returned to her house, where Detective Norris waited for the delivery of the two ounces of PCP. Based on these transactions, Morris and McDowney were both charged on two counts of distributing PCP. Morris was convicted, McDowney, however, was acquitted.

Finally, on May 30 at 5:30 p.m., Detective Norris arranged for one more purchase of PCP. Morris indicated that she could fill Norris' order for two ounces by going to her "same people." After taking $800 from the Detective, Morris again left the house for 7th and T. While waiting at the corner, Morris met McDowney, and together they walked east on T Street. Losing sight of the two, and assuming that there had been an exchange of drugs for money, the police arrested Morris and McDowney. The police searched both incident to arrest and found no drugs on McDowney and found on Morris the same marked $800 that Detective Norris had given her earlier. Neither was charged with a crime based on this brief meeting.

■ Appellants claiming that their conspiracy convictions were based on insufficient evidence must establish that even after viewing "the evidence in the light most favorable to the prosecution, *any* rational trier of fact could [not] have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). And since a conspiracy is by nature secret, the jury may fairly infer the existence of the agreement through either direct or circumstantial evidence. *See Direct Sales Co. v. United States,* 319 U.S. 703, 714, 63 S.Ct. 1265, 1270–71, 87 L.Ed. 1674 (1943); *see also United States v. Tyler,* 758 F.2d 66, 68 (2d Cir.1985).

■ To assess whether Morris and McDowney entered into an agreement in this case, we may look at the full pattern of activities presented to the jury—including evidence relating to McDowney's distribution charges. The jury's acquittal of McDowney on the distribution charges is quite irrelevant to whether or not he could be found to have taken part in a conspiracy to commit the underlying offense and does not restrict our review of all the evidence. *See United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932). But even taking into account that evidence, we do not be-

lieve that there was a sufficient showing for the jury to find a conspiracy between Morris and McDowney.

The government has only produced evidence from which it could be concluded that McDowney, on two occasions on May 14, sold a total of three ounces of PCP to Morris.[1] Governing law seems perfectly clear, which the government does not dispute, that a buyer-seller relationship does not make out a conspiracy even if the item sold is one to be used illegally. *See Direct Sales Co. v. United States*, 319 U.S. 703, 709, 711–12 & n. 8, 63 S.Ct. 1265, 1268, 1269–70 & n. 8, 87 L.Ed. 1674 (1943); *United States v. Falcone*, 311 U.S. 205, 207, 61 S.Ct. 204, 205, 85 L.Ed. 128 (1940); *United States v. Bascaro*, 742 F.2d 1335, 1359 (11th Cir.1984); *United States v. Meyers*, 646 F.2d 1142, 1145 (6th Cir.1981); *United States v. Bailey*, 607 F.2d 237, 245 (9th Cir.1979); *United States v. Watson*, 594 F.2d 1330, 1337 (10th Cir.1979).

█ The government argues that Morris' May 13 reference to "my people" being available "after 3:00" supports an inference that McDowney was a regular source. That statement we believe is insufficient to establish the proposition. Lacking further particularity, "my people" could refer to virtually any number of vendors at the "open-air market," and it does not even suggest a continuous relationship with McDowney. *Compare United States v. Resnick*, 745 F.2d 1179, 1181–82 (8th Cir. 1984) (upheld conviction where defendant was identified as a regular source of five years). The government's contention that Morris was familiar with the price to be charged for PCP suggests, in light of the parties' agreement that there were a number of vendors at the market, nothing more than that there was (unfortunately) an efficient market for PCP at 7th and T. Since the government presented no evidence that distinguishes this from the paradigm casual buyer-seller relationship, *see, e.g., Meyers*, 646 F.2d at 1145, we have no choice but to reverse the conviction of both appellants on the conspiracy charge. There are no indications that appellants had knowledge of and formed the intent to promote a conspiracy.[2] *See Direct Sales*, 319 U.S. at 711, 63 S.Ct. at 1269; *but cf. United States v. Esdaille*, 769 F.2d 104 (2d Cir.), *cert. denied*, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985).

Finally, Morris also argues that she was improperly charged with two counts of distribution arising from the events of May 14 when she only committed one act—the sale of PCP to Detective Norris. Here, Morris blends two arguments: that the two deliveries of PCP on May 14 were meant to be one sale and that to the extent there were two sales, the government entrapped her into dividing the transaction and therefore committing two crimes as opposed to one. Neither argument is persuasive.

█ It is clear that Morris committed two separate crimes on May 14. In Counts III and IV, Morris was charged under 21 U.S.C. § 841(a)(1) with the "distribution" of PCP. The term "distribution" does not refer generally to a "sale" but rather means "delivery," or "actual, constructive, or attempted transfer of a controlled substance." 21 U.S.C. § 802(8), (11). This case is no different from *United States v. Thompson*, 624 F.2d 740 (5th Cir.1980), where a physician was convicted on three separate distribution counts under 21 U.S. C. § 841 (a)(1) for writing three separate prescriptions on the same day at the same time in exchange for one payment by an undercover agent. *See also United States v. McDonald*, 692 F.2d 376 (5th Cir.1982), *cert. denied*, 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983). We conclude that Morris' dual deliveries of PCP to Detective Norris on May 14 rightly exposed her to being charged twice. Morris might have a defense to one of her convictions arising out of the two transactions on May 14 if she had been entrapped. But, Morris did

---

1. McDowney was not placed at the scene of the sale on May 9, and his apparently innocent walk with Morris on May 30 does not support an inference that they had reached a conspiratorial agreement.

2. The government does not argue in its brief that the quantity of PCP sold in this case has any significance to a conspiracy finding.

not raise this defense in the district court and is therefore foreclosed from raising it now on appeal. *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084–85 (D.C.Cir.1984).

For the foregoing reasons, the conspiracy convictions of Morris and McDowney are reversed and the convictions of Morris under Counts III and IV are affirmed.

*It is so ordered.*