UNITED STATES of America, Appellee,

v.

Luz MEDINA, Silverio Polanco, Franklin Marmolejo, Juan A. Mata, Defendants,

Franklin Marmolejo, Silverio Polanco and Juan A. Mata, Defendants–Appellants.

No. 1453, Dockets 91–1033, 91–1034 and 91–1130.

United States Court of Appeals, Second Circuit.

Argued July 25, 1991.

Decided Aug. 30, 1991.

Charles D. Adler, New York City (Glotzer & Adler, of counsel), for defendant-appellant Polanco.

Adina Schwartz, New York City (The Legal Aid Society, of counsel), for defendant-appellant Marmolejo.

Jorge DeJesus Guttlein, New York City (Aranda & Guttlein, of counsel), for defendant-appellant Mata.

Mark J. Stein, Asst. U.S. Atty., S.D.N.Y. (Otto G. Obermaier, U.S. Atty., Daniel C. Richman, Asst. U.S. Atty., S.D.N.Y., of counsel), for appellee.

Before WINTER, ALTIMARI and MAHONEY, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendants-appellants Franklin Marmolejo, Silverio Polanco, and Juan Mata appeal from judgments of conviction entered in the United States District Court for the Southern District of New York (John F. Keenan, *Judge*). The underlying two-count indictment charged the defendants in Count One with conspiracy to possess with the intent to distribute in excess of 500 grams of cocaine, in violation of 21 U.S.C. § 846 (1988). Count Two charged defendant Mata with using a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (1988). Following a five-day jury trial, Marmolejo, Polanco, and Mata were convicted as charged.

On appeal, all three defendants contend that the district court erred by denying their requests to instruct the jury on the issue of multiple conspiracies. Defendant Mata also argues that there was insufficient evidence to support his conviction under either count of the indictment. Mata further contends that the district court erred in failing to suppress evidence seized from his apartment.

For the reasons set forth below, the judgments of conviction are affirmed.

## BACKGROUND

The government's evidence at trial showed that in January 1990, a Drug Enforcement Administration ("DEA") informant named "Maria" visited a beauty shop where defendant Luz Medina worked. After several visits to the shop, the two became friends. Thereafter, Maria met with Medina and defendant-appellant Polanco at Medina's home and told them that she was a drug dealer. Medina and Polanco indicated that they would find customers for her. Several days after this meeting, Maria phoned Medina and explained that she was arranging for a man who had drugs to sell to contact Medina. Subsequently, DEA informant Mario Perez visited Medina at the beauty shop and told her that he was

a cocaine dealer, and that a kilogram of his cocaine cost $19,000. In response, Medina told Perez that she would contact him when she had a buyer.

Medina then informed Polanco of her meeting with Perez. The next day, Polanco told Medina that a man named "Franklin," later identified as defendant-appellant Marmolejo, wanted to buy two kilograms of cocaine. Medina relayed this information to Perez, and the two arranged to complete the transaction the following day. On January 23, 1991, Medina, Polanco, and Marmolejo traveled to 66th Street and West End Avenue in Manhattan to meet Perez. En route, Polanco promised Medina $500 if the deal went through. Upon arrival, the trio met Perez as planned. Marmolejo told Medina that he had to call the "money man," later identified as defendant-appellant Mata, to find out if he wanted to meet them at 66th Street. After Marmolejo called Mata from a public telephone, Marmolejo told Medina that they had to pick Mata up at 144th Street and Broadway.

Medina, Marmolejo, and Polanco then proceeded by livery cab to 144th Street, followed by Perez in his car. A team of DEA agents, who had been surveilling the 66th Street meeting, also followed. Along the way, Marmolejo commented that if Perez had more cocaine, he "would keep buying for somebody else." Upon their arrival at 144th Street, Mata met the group and informed them that the deal would be finalized at his apartment, located at 621 West 172nd Street. Mata then joined Medina, Marmolejo, and Polanco in their cab and travelled to his apartment. Perez, trailed by the DEA agents, again followed in his car. Upon arriving at 172nd Street, Perez and the four defendants proceeded to Mata's apartment.

Once inside the apartment, Mata stated that he was going to his bedroom to get the buy money. Moments later, Mata returned with a bag containing almost $47,000 in cash and handed it to Perez. Perez dumped the money onto the dining room table and asked Mata and Marmolejo to accompany him to his car to get the co-caine. Polanco and Medina remained in the apartment. Once outside, Perez gave DEA agents a pre-arranged signal and the agents arrested Mata and Marmolejo. Perez told the agents that "the money was in apartment 39" and that there were "other people in the apartment" who expected the trio to return.

DEA Agent Jonathan Wilson and a group of six other DEA Agents then went to apartment 39, knocked on the door, and announced "police" in both Spanish and English. No one answered the door. After hearing scuffling noises and people speaking in Spanish, the agents forced the door using a battering ram. Upon entering the apartment, the agents saw two men, two women, and a small child. Recognizing Medina and Polanco from their earlier surveillance, the agents placed them under arrest. Near the entrance, agents also saw a large quantity of cash on the dining room table. The agents, including Agent Wilson, then conducted a protective sweep of the premises. When Wilson entered Mata's bedroom, he saw a .9 millimeter pistol and a spare loaded magazine in a partially opened gun case lying on a table next to the bed. The agents seized the cash and the gun.

The government filed a two count indictment against the defendants. Count One charged Mata, Medina, Marmolejo, and Polanco with conspiracy to possess with the intent to distribute in excess of 500 grams of cocaine, in violation of 21 U.S.C. § 846. Count Two charged Mata alone with using a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

Mata filed a motion to suppress the cash and gun seized from his apartment, contending that the physical evidence was seized during a warrantless search in contravention of the fourth amendment. After holding an evidentiary hearing, Judge Keenan found that exigent circumstances justified the warrantless entry into Mata's apartment and that the agents properly seized the physical evidence found there in plain view.

Prior to trial, Medina pleaded guilty to Count One of the indictment and was sentenced to four years of probation, with a condition that she perform 200 hours of community service annually during the probation period. Medina testified on behalf of the government at trial. Following a five-day trial before Judge Keenan and a jury, Mata, Marmolejo, and Polanco were convicted on Count One of the indictment. Mata was also convicted on Count Two. Mata was sentenced to eight years in prison on Count One and to five years in prison on Count Two, the sentences to run consecutively, followed by five years of supervised release. Marmolejo was sentenced to seven years in prison, followed by four years of supervised release. Polanco was sentenced to a thirteen-year term of imprisonment, followed by eight years of supervised release. This appeal followed.

## DISCUSSION

### I. *The District Court's Refusal To Give A Multiple Conspiracies Instruction.*

The indictment in the instant case charged all of the defendants with participation in a single conspiracy to possess and distribute cocaine. The defendants requested the district court to give the jury an instruction on multiple conspiracies. The defendants also requested an instruction that a mere "buyer-seller" relationship in a single transaction does not alone support a conspiracy conviction. *See United States v. Morris,* 836 F.2d 1371, 1374 (D.C.Cir.1988); *United States v. Mancillas,* 580 F.2d 1301, 1307 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). These two requests are interrelated as the overarching defense theory was that there were two conspiracies afoot: a "buyer" conspiracy and a "seller" conspiracy. According to defendants Mata and Marmolejo, there existed a conspiracy involving Medina, Polanco, and Marmolejo to sell cocaine for the DEA informants to Mata, as the sole buyer, or to Mata and whatever unknown persons were associated with him. Alternatively, defendant Polanco claims that the evidence demonstrated a conspiracy between him and Medina to sell cocaine to Marmolejo and Mata, who allegedly formed a separate "buyer" conspiracy. The district court refused to give either requested instruction, finding that no view of the facts supported the existence of multiple conspiracies or justified giving a "buyer-seller" instruction. On appeal, all three defendants contend that the district court erred in refusing to give the requested instructions. We disagree.

It is well-established that a criminal defendant is entitled to a jury instruction reflecting his or her theory of defense "for which there is some foundation in the proof, no matter how tenuous that defense may appear to the trial court." *United States v. Dove,* 916 F.2d 41, 47 (2d Cir. 1990). The defense theory in the instant case was that instead of the single conspiracy to possess (buy) cocaine with the intent to distribute, there were separate conspiracies consisting of a "buyer" group and a "seller" group.

Where there is evidence supporting an inference that there existed more than one conspiracy, the issue of single versus multiple conspiracies is a jury question. *See, e.g., United States v. Alkins,* 925 F.2d 541, 553–54 (2d Cir.1991) (citation omitted). However, "'if only one conspiracy has been alleged and proved [, a] defendant[ is] not entitled to a multiple conspirac[ies] charge.'" *United States v. Maldonado–Rivera,* 922 F.2d 934, 962 (2d Cir. 1990) (quoting *United States v. Martino,* 664 F.2d 860, 875 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982)), *cert. denied,* — U.S. ——, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991). To prove the existence of a single conspiracy, the government must demonstrate that the alleged conspirators agreed on a common unlawful goal. *Alkins,* 925 F.2d at 554; *Maldonado–Rivera,* 922 F.2d at 963. Co-conspirators need not, however, agree "on the details of the conspiracy, so long as they agree[ ] on the essential nature of the [unlawful] plan." *Maldonado–Rivera,* 922 F.2d at 963; *United States v. Bagaric,* 706 F.2d 42, 63 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983). Moreover, it is not

essential that the alleged conspirators know the identities of the other conspirators for a single conspiracy to exist. *Maldonado–Rivera*, 922 F.2d at 963.

■ "Even if a multiple conspiracies charge should have been given, the failure to do so does not automatically require reversal." *Alkins*, 925 F.2d at 554. To obtain a reversal, a defendant must show "'both the likelihood of multiple conspiracies having existed, and substantial prejudice resulting from the failure to give the requested charge.'" *Id.* (quoting *United States v. Barlin*, 686 F.2d 81, 89 (2d Cir. 1982)). In order to demonstrate the existence of multiple conspiracies, a defendant must show evidence of "'separate networks operating independently of each other.'" *Id.* (quoting *Barlin*, 686 F.2d at 89); *see also Maldonado–Rivera*, 922 F.2d at 962 (citation omitted).

■ In the instant case, the district court did not err in refusing to give the requested multiple conspiracies instruction because the evidence showed only a single conspiracy involving all of the indicted defendants in an integrated, common effort to buy cocaine for distribution. Upon learning that DEA informant "Maria" was a drug trafficker, Medina and Polanco undertook to find buyers. After DEA informant Perez indicated his cocaine was for sale at $19,000 per kilogram, Polanco contacted Marmolejo, who in turn contacted Mata, "the money man." Highlighting their role as allies in the buy transaction, Medina, Polanco, and Marmolejo traveled together to meet Perez and to pick up Mata, who joined them in their taxi to proceed to his apartment. Perez traveled alone each time in his own car. In addition, Marmolejo's comment that if Perez had more drugs, he would "buy[ ] for somebody else" further underscores his role as a buyer. Similarly, in light of the fact that Perez offered no monetary reward to any of the defendants, Polanco's offer to pay Medina $500 if the deal went through indicates that Polanco stood to gain from the purchase and distribution of the cocaine. Finally, given the quoted price of the cocaine, and the amount of buy money recovered

from Mata's apartment (almost $47,000), it is clear that the transaction was for wholesale quantities of cocaine (two to three kilograms) destined for resale.

There is thus no credible evidence suggesting the existence of an independent "sellers" conspiracy that operated separately from the single conspiracy charged in the indictment. The court was therefore justified in refusing to give the requested multiple conspiracies instruction. *See Alkins*, 925 F.2d at 554; *Maldonado–Rivera*, 922 F.2d at 963. In addition, even if it could have been inferred that there were multiple conspiracies operating, the defendants would not be entitled to reversal. Given the overwhelming evidence indicating the defendants' participation in the charged conspiracy, they could not demonstrate substantial prejudice from the court's refusal to give the multiple conspiracies instruction. *See Maldonado–Rivera*, 922 F.2d at 964.

■ Similarly, because the evidence indicated that the defendants formed only a single conspiracy to buy cocaine for redistribution, the district court did not err in refusing to give the related "buyer-seller" instruction. Moreover, even if the defendants could rationally be divided into buyers and sellers, defendants' requested instruction that a mere buyer-seller relationship is insufficient to establish a distribution conspiracy is unwarranted under the facts of this case. The rationale for holding a buyer and a seller not to be conspirators is that in the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, there is no evidence that the parties were aware of, or agreed to participate in, a larger conspiracy. *See Morris*, 836 F.2d at 1374; *United States v. McIntyre*, 836 F.2d 467, 471–72 (10th Cir.1987); *United States v. Meyers*, 646 F.2d 1142, 1145 (6th Cir.1981). This rationale does not apply, however, where, as here, there is advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use. Under such circumstances, the participants in the transaction may be presumed to know that they are part of a

broader conspiracy. *See United States v. Magnano*, 543 F.2d 431, 434–35 (2d Cir. 1976) (citations omitted), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977); *see also United States v. Zabare*, 871 F.2d 282, 286–87 (2d Cir.), *cert. denied*, 493 U.S. 856, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989). As a result, labels such as "buyer" or "seller" are essentially superfluous. Because the facts of this case transcend the usual "buyer-seller" scenario, the district court was justified in concluding that the "buyer-seller" issue was "not in the case" and in refusing to give the requested "buyer-seller" instruction. *See United States v. Figueroa*, 900 F.2d 1211, 1217 (8th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 3228, 110 L.Ed.2d 675 (1990).

## II. *Mata's Challenge to the Sufficiency of the Evidence.*

Mata contends that there was insufficient evidence to support either his conspiracy conviction or his firearm conviction. In challenging a conviction on the ground of insufficient evidence, a defendant bears a heavy burden. *See, e.g., Alkins*, 925 F.2d at 555; *United States v. Gonzalez*, 922 F.2d 1044, 1053 (2d Cir.1991); *Maldonado-Rivera*, 922 F.2d at 978. A conviction must be upheld if, after viewing the evidence in the light most favorable to the government, and drawing all reasonable inferences in its favor, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ In attacking the sufficiency of the evidence to support his conspiracy conviction, Mata essentially reiterates the arguments made in connection with his challenge to the court's refusal to give a multiple conspiracies or a "buyer-seller" instruction to the jury. Thus, Mata contends that the evidence demonstrated that he was a buyer and his co-defendants were sellers, and, as such, that he could not, as a mere buyer, be considered part of a conspiracy to distribute cocaine. As demonstrated above, these arguments are factually and legally untenable. Thus, viewed in the light most favorable to the government, the evidence is, as discussed in Part I, more than sufficient to enable a reasonable jury to find that Mata and his co-defendants were engaged in a common endeavor to buy cocaine with the intent to distribute it.

Mata next attacks the sufficiency of the evidence supporting his conviction under 18 U.S.C. § 924(c) for using a firearm during and in relation to a drug trafficking crime. The specific issue on appeal is whether having a loaded .9 millimeter pistol on a table in the same room where large amounts of buy money (almost $47,000) were stored is sufficient to constitute "use" under the statute.

■ To "use" a firearm under section 924(c), a defendant need not fire the weapon. Rather, "use" can be established where circumstances surrounding the crime indicate that the firearm was " 'an integral part of the narcotics offense and facilitated that offense.' " *United States v. Alvarado*, 882 F.2d 645, 653 (2d Cir.1989) (quoting *United States v. Meggett*, 875 F.2d 24, 29 (2d Cir.), *cert. denied*, 493 U.S. 858, 110 S.Ct. 166, 107 L.Ed.2d 123 (1989)), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990). We have held that this standard has been met where circumstances indicate that the defendant intended to use the weapon by strategically placing it so that it could be available for use during a drug transaction. *See Alvarado*, 882 F.2d at 654; *Meggett*, 875 F.2d at 29. For example, in *Alvarado*, three weapons were found in defendant's apartment where cocaine had been sold to DEA informants. Two of the weapons were located in a locked safe along with approximately $3,000 in cash. Next to the safe was a quantity of cocaine and a bullet-proof vest. Upholding defendant's firearm conviction, we reasoned that "a reasonable jury could infer that the guns were located there to protect both the money and the cocaine in the event a drug deal went sour and a buyer demanded a return of his cash." 882 F.2d at 654.

■ Relying principally on our decision in *United States v. Feliz–Cordero*, 859

F.2d 250 (2d Cir.1988), Mata contends that the evidence was insufficient as a matter of law to convict him of violating section 924(c). In *Feliz–Cordero*, this Court held that where a gun was found *inside* a dresser drawer in the same room as some of defendants' drug paraphernalia, the evidence was insufficient to conclude that the gun was placed for ready use during a drug transaction. *Id.* at 254. Mata argues that, as in *Feliz–Cordero*, the gun in his bedroom was not strategically placed so as to be available for use during the transaction. Specifically, Mata argues that because he brought the money out of his bedroom and left the gun behind, he did not intend to use the weapon in connection with the drug buy. Rather, Mata contends that the gun was there to protect him and his family from crime. Although this case is close given Mata's decision mid-way through the transaction to leave the gun in his bedroom, we believe that there was sufficient evidence to support Mata's conviction under 18 U.S.C. § 924(c).

Unlike *Feliz–Cordero*, where the weapon was placed in a drawer in a room containing mere narcotics paraphernalia, the firearm in the present case was placed on top of a dresser in Mata's bedroom, where he kept large sums of cash to purchase narcotics. Viewing the evidence in the light most favorable to the government, and consistent with our decisions in *Alvarado* and *Meggett*, a reasonable jury could conclude that Mata had the gun to protect his buy money. Mata's claimed reason for keeping the gun—to protect his family from crime—is unpersuasive given his decision to invite drug traffickers into his apartment and conduct drug transactions there involving wholesale quantities of cocaine. Moreover, simply because Mata decided mid-way through the transaction that he no longer needed the gun—and therefore left it in the bedroom after retrieving the cash—does not mean as a matter of law that there was insufficient evidence to support his conviction. Indeed, Mata insisted that the sale take place in the familiar surroundings of his apartment and knew that he would be able to meet Perez and evaluate the need for the gun before getting the cash from his bedroom. A jury therefore could reasonably conclude that the gun was strategically placed and available to protect the cash during the transaction as long as Mata deemed such protection necessary.

### III. *Mata's Challenge To The District Court's Suppression Ruling.*

At the suppression hearing held in the instant case, DEA Special Agent Jonathan Wilson testified that after the agents arrested Mata and Marmolejo, Perez told him that "the [buy] money was in apartment 39" and that there were "other people in the apartment" who expected Perez, Mata, and Marmolejo to return soon. Because a prolonged absence of the trio from the apartment could have made the occupants of the apartment suspicious, Wilson testified that unless the agents acted quickly, he was afraid that the buy money would be destroyed or moved. Wilson further testified that because he could not see the entrance to apartment 39 or whether the building had any rear exits or escapes, he feared that the other defendants in the apartment might flee. Accordingly, although he did not have a search warrant, Wilson decided to go directly to apartment 39. Upon reaching the apartment, Wilson testified that the agents knocked on the door and announced "police" in both Spanish and English. Although no one answered the door, the agents heard scuffling sounds and people speaking in Spanish. At that point, the agents forced open the door.

Upon entering the apartment, the agents saw and arrested defendants Medina and Polanco. Agent Wilson testified that near the entrance to the apartment, he saw a large sum of money in bundles strewn about a table. The agents seized the cash. Agent Wilson and the other agents then conducted a protective sweep of the premises. Wilson testified that upon entering Mata's bedroom, he saw a partially opened plastic gun case on a table next to the bed. Inside the case, which was similar to his own, he observed the butt of a gun and two magazines. One of the magazines was loaded into the gun. Agent Wilson seized

68

the gun case and its contents, which were later determined to be a loaded .9 millimeter pistol and a spare loaded magazine. Mata's common law wife, Rosanna Monzon, was the only witness who testified on behalf of Mata at the hearing. She testified, among other things, that she was present in the kitchen when the DEA agents arrived and that she saw no money on the dining room table when the agents entered the apartment. She further testified that she had not previously seen a gun anywhere in the apartment.

The district court found that exigent circumstances justified the warrantless entry. The court determined that the agents had probable cause to believe that a crime had been committed and that two of the defendants were still present in the apartment. The court then found that under the circumstances, the agents had to act quickly and enter the apartment to prevent the destruction or moving of evidence or the escape of the remaining defendants. *See United States v. Miles*, 889 F.2d 382, 383 (2d Cir.1989) (per curiam). In addition, the court credited the testimony of Agent Wilson and found that the physical evidence was in plain view and properly seized. On appeal, Mata argues that the district court erred in finding that exigent circumstances existed. Mata also challenges the seizure of the weapon found in his apartment. We find Mata's arguments unpersuasive.

█ Warrantless searches and seizures of an individual's home by law enforcement officers are presumptively unreasonable under the Fourth Amendment, unless exigent circumstances exist requiring entry before the officers could obtain a warrant. *See Payton v. New York*, 445 U.S. 573, 585–86, 589–90, 100 S.Ct. 1371, 1379–80, 1381–82, 63 L.Ed.2d 639 (1980); *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir.1990) (en banc), *cert. denied,* —— U.S. ——, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991); *Zabare*, 871 F.2d at 289; *United States v. Cattouse*, 846 F.2d 144, 146 (2d Cir.), *cert. denied,* 488 U.S. 929, 109 S.Ct. 316, 102 L.Ed.2d 335 (1988). A district court's finding that exigent circumstances existed justifying such a warrantless entry

will not be overturned unless it is "clearly erroneous." *MacDonald*, 916 F.2d at 769; *Cattouse*, 846 F.2d at 146.

█ "[T]he test for determining whether a warrantless entry is justified by exigent circumstances is an objective one...." *MacDonald*, 916 F.2d at 769; *Zabare*, 871 F.2d at 291. The district court must determine, considering the totality of the circumstances of the particular case, "whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *MacDonald*, 916 F.2d at 769 (quoting *Dorman v. United States*, 435 F.2d 385, 391 (D.C.Cir.1970) (en banc)); *see also Miles*, 889 F.2d at 383. To guide the district court's inquiry into whether exigent circumstances exist, we have adopted the factors set forth in *Dorman*, 435 F.2d at 392–93. *See, e.g., MacDonald*, 916 F.2d at 769; *United States v. Crespo*, 834 F.2d 267, 270 (2d Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988). As summarized in *MacDonald*, a district court should consider:

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause ... to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

916 F.2d at 769–70 (citations omitted). These factors are merely illustrative, not exhaustive, and the presence or absence of any one factor is not conclusive. *Id.* at 770; *Cattouse*, 846 F.2d at 147 (citation omitted).

█ Applying these standards to the instant case, Judge Keenan's finding that there were exigent circumstances justifying the warrantless entry was not clearly erroneous. The suspects were in the midst of a large scale narcotics transaction. Moreover, as the district court found, based on their own observations and on the

report of the DEA informant Perez, the DEA agents clearly had probable cause to believe that Medina and Polanco participated in the conspiracy and were inside Mata's apartment with the buy money. Most importantly, because the defendants remaining in the apartment expected Perez, Mata, and Marmolejo to return shortly, any prolonged delay in their return while the agents obtained a warrant would create a substantial risk that they would discover that the plan had gone awry. The agents did not know whether there were any rear exits or escapes from the building. Under these circumstances, it was objectively reasonable to conclude that immediate entry was necessary to prevent the destruction or hiding of the buy money, *see Miles,* 889 F.2d at 383; *United States v. Gallo–Roman,* 816 F.2d 76, 79 (2d Cir.1987), or the escape of suspects.

We note further that by knocking and announcing that they were law enforcement officers, the agents acted according to the law and attempted a " 'peaceful entry.' " *MacDonald,* 916 F.2d at 771 (citation omitted). Although Mata contends that the agents created the exigency by knocking on the apartment door, it is plain from the foregoing that the exigent circumstances existed prior to the knocking. Moreover, even assuming that there were no exigent circumstances prior to the knock, the agents did not wrongfully create such circumstances by knocking and announcing their presence. Simply because a suspect reacts to the knock and announcement "by attempting to escape, destroy evidence, or engage in any other unlawful activity," does not prevent law enforcement agents from lawfully interdicting such activity. *MacDonald,* 916 F.2d at 771. As we held in *MacDonald,* "when law enforcement officers act in an entirely lawful manner, they do not impermissibly create exigent circumstances." *Id.* at 772. Accordingly, we hold that the district court correctly found that exigent circumstances existed justifying the warrantless entry into Mata's apartment.

Once lawfully inside the apartment, and following the arrests of Medina and Polanco, the agents properly conducted a protective sweep of the premises to determine if other people were there who might threaten their safety. *See Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 1099–1100, 108 L.Ed.2d 276 (1990); *United States v. Mickens,* 926 F.2d 1323, 1328 (2d Cir.1991); *United States v. Oguns,* 921 F.2d 442, 446–47 (2d Cir.1990); *United States v. Jackson,* 778 F.2d 933, 937 (2d Cir.1985), *cert. denied,* 479 U.S. 910, 107 S.Ct. 308, 93 L.Ed.2d 282 (1986). During this protective sweep, Agent Wilson saw the .9 millimeter pistol lying in the partially opened gun case in Mata's bedroom. Although Mata contends that the weapon was not in plain view because the case was not sufficiently ajar, the district court credited Wilson's testimony to the contrary, and there is no indication in the record that the district court's finding was clearly erroneous. Because the gun was in plain view, and Agent Wilson had probable cause to believe that the weapon was evidence of a crime, its seizure during the protective sweep was not improper. *Buie,* 110 S.Ct. at 1096; *Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987); *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971) (plurality opinion).

## CONCLUSION

Based on the foregoing, the judgment of the district court is affirmed.