REENA RAGGI, Circuit Judge,
concurring in part and dissenting in part.
The court today reverses a twenty-year mandatory minimum sentence imposed on David Wexler after a jury trial at which he *210 was found to have distributed, as an object of a large-scale prescription drug conspiracy, a quantity of Dilaudid that caused the death of his co-conspirator Barry Abler. See 21 U.S.C. §§ 841(b)(1)(C), 846.[1] Relying on the buyer-seller rule, the majority concludes that the evidence was insufficient as a matter of law to permit any reasonable jury to find that Wexler participated “in a conspiracy to distribute the drug Dilaudid,” because no evidence showed an agreement between Wexler and Abler for Abler to “redistributef ]” the Dilaudid that Wexler supplied. Ante at 208. I respectfully dissent from this ruling because I think it rests on an unwarranted extension of the buyer-seller rule. That rule precludes a jury from inferring the existence of a conspiracy from evidence showing nothing more than an arms-length drug sale. Where a conspiracy has been otherwise proved, however, the rule does not authorize us to carve out of the jointly undertaken scheme drug transfers from one confederate to another because of a lack of proof of intent to redistribute. Such a reading is without support in our precedent. Further, even if the rule reached that far, I am not convinced that the evidence was insufficient as a matter of law to permit a reasonable jury to find a Dilaudid distribution conspiracy because the record, viewed in the light most favorable to the government, permits an inference both that Wexler and Abler had agreed that the latter might redistribute Dilaudid and that the men had agreed to effect distribution through unwitting third parties.
1. The Buyer-Seller Rule
A transfer of drugs from a seller to a buyer necessarily involves agreement, however brief, on the distribution of a controlled substance from the former to the latter. Absent more, however, the law does not consider this momentary meeting of the minds sufficient to support a conviction for conspiring to distribute drugs. See United States v. Gore, 154 F.3d 34, 40 (2d Cir.1998) (“Without more, [a] mere buyer-seller relationship ... is insufficient to establish a conspiracy.”); see also United States v. Thomas, 284 F.3d 746, 752 (7th Cir.2002) (observing that “sale agreement” between buyer and seller “cannot be the conspiracy [to distribute], for it has no separate criminal object”) (internal quotation marks omitted). In United States v. Medina, this court explained that “[t]he rationale for holding a buyer and a seller not to be conspirators is that in the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, there is no evidence that the parties were aware of, or agreed to participate in, a larger conspiracy.” 944 F.2d 60, 65 (2d Cir.1991). The Seventh Circuit has also endeavored to state a theoretical basis for the “buyer-seller rule”:
Because the crime of conspiracy requires a concert of action among two or more persons for a common purpose, the mere agreement of one person to buy what another agrees to sell, standing alone, does not support a conspiracy conviction. The relationship of buyer and seller absent any prior or contemporaneous understanding beyond the mere sales agreement does not prove a conspiracy .... In such circumstances, the buyer’s purpose is to buy; the seller’s purpose is to sell. There is no joint objective.
*211 United States v. Mancillas, 580 F.2d 1301, 1307 (7th Cir.1978) (quoting United States v. Ford, 324 F.2d 950, 952 (7th Cir.1963)).
Heretofore, this court has carefully “confined” application of the buyer-seller rule to circumstances “where the indictment charges or the proof shows no more than the sale transaction.” United States v. Kahan, 572 F.2d 923, 935 (2d Cir.1978) (emphasis added); cf. United States v. Gore, 154 F.3d at 40.[2] Thus, where the record has shown more than a simple arms-length drug sale, the rule has not legally foreclosed a finding of conspiracy. Rather, juries have decided from the totality of the evidence whether the prosecution has satisfactorily proved the existence of a distribution agreement going beyond the discrete sale from seller to buyer.[3]
In many cases, the “more” that will demonstrate such a larger agreement is evidence of the seller’s knowledge that the buyer intends to redistribute the drugs in question. See, e.g., United States v. Medina, 944 F.2d at 65 (recognizing that such knowledge and intent may be inferred from quantity of drugs). But intended redistribution is not the only circumstance relevant to determining whether persons have a “joint objective” that goes beyond a buyer’s mere purpose to buy and a seller’s mere purpose to sell. United States v. Mancillas, 580 F.2d at 1307. “[T]he length of time that the seller affiliated with the buyer, the established method of payment (for example, whether the seller ‘fronted’ the narcotics to the buyer), the extent to which the transactions were standardized, and the level of mutual trust between the buyer and the seller,” United States v. Contreras, 249 F.3d 595, 599 (7th Cir.2001), are all factors that a jury may properly consider in deciding whether the parties are involved in a larger distribution scheme such that even a single drug sale between them might be understood as “intended to advance the ends of [that larger] conspiracy,” United States v. Mancillas, 580 F.2d at 1308.
2. The Facts in this Case Do Not Support Application of the Buyer-Seller Rule
Applying these principles to this case, and viewing the evidence in the light most favorable to the government, I think we are compelled to conclude that a rational jury could find that Wexler and Abler’s relationship was much more than that of a *212 “mere” buyer and seller, United States v. Gore, 154 F.3d at 40, involved in a “casual sale of small quantities of drugs,” United States v. Medina, 944 F.2d at 65, and that the multiple distributions of Dilaudid from Wexler to Abler were pursuant to a “contemporaneous understanding” on criminal objectives that reached far beyond any discrete cash-and-carry transaction for the particular pills that killed Abler, United States v. Mancillas, 580 F.2d at 1307.
The trial evidence convincingly demonstrated that Wexler’s overarching criminal objective was to secure personal information from a number of individuals so that he could falsely bill their insurance providers for hundreds of thousands of dollars in fictional medical services. The evidence further showed that it was in furtherance of that fraudulent purpose that Wexler assumed the role of a large-scale supplier of prescription drugs. In exchange for the personal information he needed to fuel his health care fraud scheme, Wexler supplied individuals with a wide variety of medically unnecessary drugs to which they were addicted. Barry Abler was one of these addicts. Over the course of almost ten years, from 1992 until Abler’s death in 2001, Wexler regularly supplied Abler with a variety of controlled substances to which he was addicted, including Dilaudid, Vico-din, Percocet, and Xanax.
In the course of these dealings, Abler was no mere buyer involved in casual drug purchases from an independent seller. For more than a half dozen years, Abler was Wexler’s co-conspirator in both the health care fraud scheme and its drug distribution subsidiary. Specifically, Abler introduced other addicts to Wexler as potential “patients” in the fraud scheme. Further, Abler frequently acted as a conduit between these persons and Wexler in the transfer of drugs or the scrip necessary to procure drugs. Precisely because Abler was a trusted co-conspirator in these twin criminal schemes, the record indicates that he did not pay Wexler for Dilaudid, or for any of the other drugs that he received, as would be expected in a mere buyer-seller relationship. To the contrary, it was Wexler who paid Abler with drugs and cash for his help in furthering the two conspiracies. To my mind, this evidence is enough, by itself, to take the case outside the buyer-seller rule. See generally United States v. Contreras, 249 F.3d at 599 (recognizing parties’ lengthy relationship, non-cash payment for drugs, and high level of mutual trust as factors taking case outside buyer-seller rule). A conspirator who receives contraband in return for his assistance in a drug distribution scheme is “not a simple buyer of the commodity.” United States v. Turner, 93 F.3d 276, 285 (7th Cir.1996). As this court observed in United States v. Magnano, it is “only when there is no independent evidence tending to prove that the defendant had some knowledge of the broader conspiracy and when the single transaction is not in itself one from which such knowledge might be inferred that the single [sale] act is an insufficient predicate.” 543 F.2d 431, 434-35 (2d Cir.1976) (internal citation and quotation marks omitted). Plainly that is not this case.
3. The Majority’s Insistence on Proof of an Independent Dilaudid Conspiracy
The majority nevertheless holds that the buyer-seller rule applies in this case because Count One of the indictment does not charge the § 841(b)(1)(C) enhancement by reference to the overall drug distribution conspiracy but by reference only to the specific object to “distribute and possess with intent to distribute ... ‘Dilau-did.’ ” It construes this object pleading to require evidence proving Wexler’s participation in a “conspiracy to distribute Dilau-did,” ante at 207, 208, and it concludes that *213 “the only evidence that could bring Abler and Wexler out of the realm of buyer and seller with respect to Dilaudid was evidence suggesting an intent to redistribute Dilaudid,” id. at 209. I cannot agree with this analysis.
I do not read the object clauses of Count One of the indictment to allege multiple conspiracies, each aimed at the distribution of a particular drug. Rather, I read the indictment to charge a single, larger conspiracy “to violate the narcotics laws of the United States,” Indictment ¶ 1, with multiple substantive objects, one of which was that “Wexler ... and others known and unknown, would and did distribute ... a controlled substance ... commonly known as ‘Dilaudid,’ ” which resulted in Abler’s death, Id. ¶ 2. Both Wexler’s participation in the charged larger conspiracy and his actual distribution of lethal Dilaudid to Abler are unchallenged on this appeal. Thus, whatever application the buyer-seller rule might have to determining the sufficiency of the evidence to prove a hypothetical conspiracy between Wexler and Abler to distribute only Dilaudid, I think the rule has no bearing on the question actually before us: whether a rational jury could find that Wexler’s distribution of Dilaudid to Abler was an object of the larger conspiracy proved. See United States v. Magnano, 548 F.2d at 434-35 (recognizing single drug sale as sufficient predicate where independent evidence proves defendant’s knowledge of broader conspiracy).
In ruling otherwise, the majority cites United States v. Thomas, 274 F.3d 655 (2d Cir.2001) (en banc), to support the conclusion that the government was obliged to prove a Dilaudid distribution conspiracy separate and distinct from the larger conspiracy charged in the indictment. But Thomas holds that “if the type and quantity of drugs involved in a charged crime may be used to impose a sentence above the statutory maximum for an indeterminate quantity of drugs, then the type and quantity of drugs is an element of the offense that must be charged in the indictment and submitted to the jury.” Id. at 660 (footnote omitted). In this case, the defendant plainly does not challenge the type of drug that killed Abler or the quantity of the lethal dose. The only disputed fact is whether the distribution of the Dilaudid that killed Abler was an object of the larger charged conspiracy. For reasons already discussed, I think evidence of a long-standing agreement for Wexler to supply Abler with Dilaudid and other drugs as payment for his assistance in the larger distribution scheme was sufficient to support such a finding. Nothing in Thomas or the buyer-seller rule supports our carving out of an established drug distribution conspiracy those drug transfers from one conspirator to another made as payment for services to the larger scheme. See generally United States v. Turner, 93 F.3d at 285 (observing that “consideration ... tendered for the receipt of the drugs was not a consideration unrelated to the conspiracy such as currency or even services unrelated to the conspiracy”). Nor do they warrant a legal conclusion that such transfers cannot be objects of the larger conspiracy absent proof of the conspirators’ intent to redistribute.
Even if I were to agree with the majority on this last point, however, I would still dissent because I think that the totality of the circumstances, viewed in the light most favorable to the government, would have permitted a rational jury to find a conspiratorial intent to redistribute Dilaudid. Steven Kravitz, an addict whom Abler introduced to Wexler to further both the health care fraud and drug distribution conspiracies, testified that Abler told him Wexler had offered to write as many prescriptions as Abler wanted precisely so that Abler “could make extra money sell *214 ing the prescriptions.” Trial Tr. at 220-21. Another addict, Marty Laufer, similarly testified that Wexler paid Abler by giving him $700 per month and prescriptions for personal use and sale. See id. at 858-59. This testimony, viewed together with documentary evidence of voluminous drug transfers from Wexler to Abler, supported a jury inference that, when Wexler supplied Abler with scrip, he did so with full knowledge and intent that Abler could use or sell the drugs thus secured as he wished. Nothing in the record indicated any intent by either man to exclude Dilau-did scrip from this general understanding. Although no addict testified to the actual receipt of Dilaudid from Wexler or Abler, the law is well established that a drug conspiracy requires proof only of the parties’ mutual agreement, not the consummation of any particular object. See generally United States v. Jackson, 335 F.3d 170, 182 (2d Cir.2003) (“As in all conspiracy cases, the essence of the crime is what the conspirators agreed to do, rather than what they actually did.”). From evidence of Abler’s seemingly limitless access to scrip from Wexler and his manipulation of such scrip over many years, whether in his own name or that of others, the jury could reasonably have concluded both that Abler was as ready to distribute Dilaudid for the right price as any other drug supplied to him and that Wexler supplied Dilaudid scrip with that understanding.[4]
Finally, even if we were dealing here only with Dilaudid transfers between Wex-ler and Abler unrelated to any larger eon-spiracy, I think a rational jury could find an independent conspiracy to distribute Dilaudid. The record plainly demonstrates that the two men never contemplated effecting these transfers by themselves. Rather, the attainment of their Dilaudid distribution objective required concerted action to deceive essential, albeit unwitting, third parties, namely, the licensed pharmacists who would actually distribute Dilaudid pills to Abler. Pursuant to this agreement, Wexler would write fraudulent prescriptions that Abler would present to pharmacists fraudulently to induce them to dispense Dilaudid. This evidence was sufficient to support a jury finding that Wexler and Abler had entered into a conspiracy to secure the unlawful distribution of Dilaudid regardless of whether or not they intended to redistribute the drugs. See generally United States v. Bommarito, 524 F.2d at 144 (noting that involvement of third party defeats Wharton’s Rule).
4. Conclusion
To summarize, because (1) the government’s proof of Wexler’s and Abler’s involvement in the large-scale drug distribution conspiracy charged in Count One is essentially undisputed, the concern animating the buyer-seller rule — that a jury would impermissibly infer conspiracy from a simple drug sale — is not present in this case. Further, because (2) sufficient evidence was adduced to permit a rational jury to find that Wexler routinely trans *215 ferred Dilaudid and other drugs to Abler not pursuant to arms-length sales, but as payment for Abler’s role in the larger drug and health care fraud conspiracies, I think the buyer-seller rule has no application to the facts of this case. Certainly, I do not think the rule authorizes us to carve the men’s Dilaudid transfer agreement out of the larger distribution conspiracy to which it is linked or to conclude, as a matter of law, that such a transfer agreement cannot be an object of the larger conspiracy absent proof of a further intent to redistribute. Even if I were wrong in that respect, because (3) the evidence, viewed in the light most favorable to the government, would permit a rational jury to find a tacit agreement between Wexler and Abler that the latter could redistribute any drugs supplied by the former — including Dilau-did — it was necessarily sufficient, even under the majority’s expansive construction of the buyer-seller rule, to prove an independent Dilaudid distribution conspiracy. The same conclusion follows from (4) trial evidence that Wexler and Abler engaged in concerted action to have their Dilaudid distribution objective effected by unwitting third-party pharmacists.
For these reasons, I would affirm the challenged twenty-year sentence. I join the majority in affirming Wexler’s conviction in all other respects.

. The application of the statutory enhancement to Wexler is particularly apt because, as a licensed physician, he had more reason than the average street dealer to be aware of the potentially lethal effect of the drugs that he was illegally providing to numerous addicts, including Abler.

. In United States v. Bommarito, this court also rejected the application of Wharton's Rule to drug conspiracies. 524 F.2d 140, 143 (2d Cir. 1975) (stating rule as follows: "‘An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission.' 1 Anderson, Wharton's Criminal Law and Procedure § 89, p. 191 (1957).”). The court cited the legislative history of 21 U.S.C. § 846 as "persuasive evidence ... that a conspiracy to violate [federal drugs laws] should constitute a separate crime in addition to the substantive offense.” Id. at 144.

. Unlike defendants in many buyer-seller cases, Wexler never asked for a jury charge on the rule, did not argue the point in summation, and did not object to the trial court's failure to reference the rule in its conspiracy instruction. See, e.g., United States v. Medina, 944 F.2d at 65-66 (discussing when buyer-seller instruction would be warranted). This may be a function of his decision to challenge the government's case on its most basic level by arguing a failure to prove that his prescriptions were not bona fide. Only after the jury resolved this issue against him did Wexler present the district court and this court with buyer-seller challenges never argued to the jury. These circumstances highlight why a high standard is set for a legal sufficiency challenge and why we will not reverse a jury verdict except upon a showing that no rational factfinder could have found guilt proved even on a view of the record evidence most favorable to the government.

. The majority assigns significance to Krav-itz's failure to include Dilaudid among the drugs Wexler prescribed for others. See ante at 208. Given that Kravitz also failed to name Percocet as one of the drugs so prescribed, while Laufer testified that Wexler prescribed Percocet for him, a reasonable jury might well have concluded that Kravitz's knowledge of Wexler’s drug distribution scheme was incomplete. Such a conclusion would hardly foreclose a jury determination that the evidence, as a whole, supported an inference of an understanding between Wex-ler and Abler that Abler could redistribute any drugs supplied to him by Wexler.