14 F.3d 603
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Darrell H. STANFIELD, Defendant-Appellant.
 No. 93-1587.
 United States Court of Appeals, Sixth Circuit.
 Dec. 16, 1993.
 
 Before: MILBURN and BATCHELDER, Circuit Judges; and COHN, District Court Judge.*
 PER CURIAM.
 
 
 1
 Defendant Darrell H. Stanfield appeals his conviction and sentence for conspiracy to distribute cocaine in violation of 21 U.S.C. Secs. 841(a) and 846, and aiding and abetting the possession with intent to distribute cocaine in violation of 21 U.S.C. Sec. 841(a). On appeal, the issues are (1) whether defendant's conviction for conspiracy constituted clear error, (2) whether alleged prosecutorial misconduct constituted plain error, (3) whether the district court's computation of the amount of cocaine for which defendant was to be held accountable constituted clear error, (4) whether the district court's application of the relevant conduct provision contained in the United States Sentencing Guidelines ("Guidelines") constituted clear error, (5) whether it was plain error for the district court to include in the sentencing calculation cocaine purchased as a result of the prosecution's alleged manipulation of defendant's sentence, and (6) whether the district court properly computed defendant's criminal history category. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 On August 17, 1992, Tyrone Dabney approached Corey "Pokey" Goss and inquired about the purchase of one-half kilogram of cocaine. Goss indicated that the price would be approximately $14,000.00 but stated that he would have to inquire whether he could obtain the cocaine. In the presence of Dabney, Goss then called defendant Stanfield. Dabney spoke with defendant and negotiated a price of $13,500.00. Later that day, Goss, evidently acting on behalf of defendant, delivered the one-half kilogram of cocaine to Dabney's residence. Dabney paid Goss $9,900.00. Several days later, Dabney saw defendant and paid him approximately $2,600.00 which was to be applied towards the purchase of the one-half kilogram of cocaine. Dabney also informed defendant that he would pay the balance at a later date.
 
 
 3
 Soon thereafter, Dabney was contacted by a prospective drug purchaser who wished to buy one kilogram of cocaine. Dabney contacted defendant to obtain the cocaine, and on August 24, 1992, defendant personally delivered one kilogram of cocaine to Dabney. The quoted price was $27,000.00, but no money was exchanged at delivery. Later that evening, Dabney was arrested by state and federal officials while attempting to deliver the cocaine to the purchaser.
 
 
 4
 In an effort to apprehend Dabney's supplier, the Tri-County Metro Narcotic Squad entered into a Letter of Understanding with Dabney which was dated August 25, 1992. Pursuant to that Understanding, Dabney agreed to cooperate in a joint federal-state investigation which sought to uncover the source of the cocaine Dabney possessed at the time of his arrest. The sting operation began immediately. During the evening of August 25, 1992, a call was made to defendant Stanfield's paging number, and a message was left for him to call a number which was being monitored by law enforcement officials. Soon after the page was made, defendant called and spoke with Dabney. The two agreed that Dabney would pay defendant the next day for the kilogram of cocaine Dabney had obtained earlier. The following afternoon, Dabney and defendant conversed several more times on the monitored phone line. During one of the conversations, Dabney indicated that he wished to purchase an additional kilogram of cocaine. Defendant purportedly informed Dabney that in order to obtain additional cocaine, he would need the payment from Dabney for the previous cocaine purchase. The two arranged for the payment later that day at defendant's residence.
 
 
 5
 In preparation of the meeting between defendant Stanfield and Dabney, law enforcement officials inserted a recording device in Dabney's pocket. The officials also provided Dabney with $28,000.00 in cash, packaging the money in a paper sack. In order to document these monies, the officials recorded the serial numbers and also coated the currency with an invisible chemical, which, when exposed to black light, would emit a fluorescent glow. Dabney drove himself to defendant's residence in a rented car, while police officials followed. Dabney delivered the cash to defendant and then left after staying no more than two minutes.
 
 
 6
 Defendant Stanfield was later stopped while driving his car and arrested. A search of defendant's vehicle uncovered no evidence. However, when defendant's hands were exposed to a black light, purple splotches appeared, marks which ordinarily exist as a result of contact with the chemical substance used to coat the recorded currency. Moreover, at the time of his arrest, defendant was carrying a Motorola telephone pager, which, when later tested, responded to the number used to reach defendant earlier. Upon securing a search warrant of defendant's apartment, police officials discovered the paper sack containing the $28,000.00 and a utility bill addressed to defendant at the apartment's address.
 
 B.
 
 7
 A two-count indictment was subsequently filed in the district court. Count one charged that between approximately August 17, 1992, and August 26, 1992, defendant Stanfield and Goss "willfully and unlawfully combine[d], conspire[d], confederate[d] and agree[d] together and with Tyrone Dabney and other persons ... to distribute and possess with intent to distribute more than 500 grams of a substance or mixture containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a) and 846."[1] J.A. 19. Count two charged that on approximately August 24, 1992, defendant "knowingly, willfully and unlawfully distribute[d] and aid[ed], abet[ted] or cause[d] Tyrone Dabney to possess with intent to distribute approximately one kilogram of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)." J.A. 20.
 
 
 8
 Dabney testified at trial on behalf of the government. During his direct testimony, the prosecution introduced the tapes of the recorded conversations between Dabney and defendant Stanfield and questioned Dabney as to the meaning of many of the statements made. Dabney testified that during one conversation defendant agreed to supply him with another kilogram of cocaine upon payment of the first kilogram.
 
 
 9
 Dabney also described on direct examination the various agreements into which he entered with state and federal law enforcement officials. The first agreement Dabney described was the Letter of Understanding between Dabney and the Tri-County Metro Narcotic Squad, which was dated August 25, 1992. According to that document, Dabney agreed, among other things, to "testify truthfully in all required court proceedings" which might arise out of his cooperation with the police officials during the efforts to arrest defendant. J.A. 132. In return, the authorities agreed to seek only federal prosecution against Dabney for the pending criminal charges arising out of the August 24, 1992, arrest. At that time, Dabney potentially faced a life sentence under Michigan law. Federal law did not provide such a sentence.
 
 
 10
 The second agreement to which Dabney referred was made between the United States Attorney's Office for the Western District of Michigan and Dabney in response to Dabney's offer to cooperate with law enforcement officials. Under that agreement, dated August 27, 1992, Dabney promised to reveal information about his prior drug transactions to the law enforcement officials and to tell the truth about such matters if called upon to testify as a witness. The agreement also provided that if Dabney falsely implicated innocent people, he could be prosecuted for making those statements. In return, the government agreed that if Dabney was unable to cooperate in the investigation, if a court would reject a plea agreement between the government and Dabney, or if the government chose not to use Dabney as a witness, no information revealed by Dabney during the attempted negotiations could be used against him.
 
 
 11
 The final agreement to which Dabney referred was a plea agreement entered between the government and Dabney. In that agreement, Dabney pled guilty to the crime of conspiracy to distribute more than one kilogram of cocaine with defendant Stanfield and Goss. Moreover, Dabney agreed to fully cooperate with federal and state officials in the investigation of past drug offenses by, among other things, "truthfully answering investigators' questions, meeting with prosecutors before testifying, truthfully testifying before grand juries and at trial and providing relevant objects, documents and photographs in [his] possession or under his control." J.A. 147. For its part, the government agreed not to bring additional charges against Dabney arising out of the conspiracy and also agreed to recommend a sentence at the lowest end of the applicable guideline range.
 
 
 12
 The jury found defendant Stanfield guilty on both counts and found Goss not guilty on count one. Defendant was subsequently sentenced to 96 months' imprisonment on count one and 96 months' imprisonment on count two with the sentences to run concurrently. This timely appeal followed.
 
 II.
 A.
 
 13
 Defendant Stanfield argues that in order to convict an individual for conspiracy, the government must show more than a buyer-seller relationship between co-conspirators. According to defendant, the government must establish that defendant has identified with the purposes and goals of the conspiracy and that the defendant has joined the conspiracy as opposed to simply dealing with the conspiracy at arm's length. He argues that in this case, while the evidence may have shown that he sold cocaine to Dabney, no evidence exists which shows that he joined the conspiracy. Thus, he argues that the government failed to present sufficient evidence to support his conviction for conspiracy to distribute cocaine.
 
 
 14
 Ordinarily, "the standard of review for claims of insufficient evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Evans, 883 F.2d 496, 501 (6th Cir.1989) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). However, where, as here, a defendant fails to offer a timely motion for judgment of acquittal following the verdict pursuant to Federal Rule of Criminal Procedure 29(c), the defendant's objection to the sufficiency of the evidence is deemed waived. United States v. Wright-Barker, 784 F.2d 161, 170 (3d Cir.1986); 2 Charles A. Wright, Federal Practice and Procedure Sec. 469 (1982). Absent plain error, the conviction will be affirmed. Cf. United States v. Swidan, 888 F.2d 1076, 1080 (6th Cir.1989) (" 'Absent a manifest miscarriage of justice, we are unable to review the district court's denial of a Rule 29 Motion where the defendant did not renew that Motion at the close of all the evidence.' " (quoting United States v. Faymore, 736 F.2d 328, 334 (6th Cir.), cert. denied, 469 U.S. 868 (1984))).
 
 
 15
 Federal Rule of Criminal Procedure 52(b) is the applicable rule governing our review for plain error. Under Rule 52(b), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Recently, in United States v. Olano, 113 S.Ct. 1770 (1993), the United States Supreme Court set forth the four relevant criteria in determining whether a Rule 52(b) remedy is appropriate: (1) we are to consider whether an error occurred in the district court. Id. at 1777. Absent any error, our inquiry is at an end. However, if an error occurred, (2) we then consider if the error was plain. Id. If it is, then (3) we proceed to inquire whether the plain error affects substantial rights. Id. at 1777-78. Finally, even if all three factors exist, (4) we must then consider whether to exercise our discretionary power under Rule 52(b), or in other words, we must decide whether the plain error affecting substantial rights seriously affected the fairness, integrity or public reputation of the proceedings. Id. at 1779.
 
 
 16
 We conclude that there was sufficient evidence to support defendant's conspiracy conviction, and thus that no error occurred. To establish that an individual conspired with another to distribute and possess with intent to distribute a controlled substance, "the government is required to prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join, and participated in the conspiracy." United States v. Lee, 991 F.2d 343, 348 (6th Cir.1993) (citing United States v. Sanchez, 928 F.2d 1450, 1457 (6th Cir.1991)). Though "[a] trier of fact may infer knowledge of and participation in the common purpose and plan of a conspiracy based on defendant's actions and reactions to the circumstances," United States v. Barrett, 933 F.2d 355, 359 (6th Cir.1991) (citing United States v. Christian, 786 F.2d 203, 211 (6th Cir.1986)), as correctly noted by defendant, the mere fact that a defendant sold drugs to an alleged coconspirator, without more, is not enough to prove that the actors acted pursuant to a conspiracy. United States v. Meyers, 646 F.2d 1142, 1145 (6th Cir.1981); see also United States v. Morris, 836 F.2d 1371, 1374 (D.C.Cir.1988) ("a buyer-seller relationship does not make out a conspiracy even if the item sold is one to be used illegally"); United States v. Baker, 905 F.2d 1100, 1106 (7th Cir.) ("A buyer does not automatically become a member of the conspiracy," rather "[t]he prosecution must establish by substantial evidence that the defendant knew the existence and scope of the conspiracy and sought to promote its success." (citations omitted)), cert. denied, 498 U.S. 876 and 904 (1990).
 
 
 17
 "The rationale for holding a buyer and a seller not to be conspirators is that in the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, there is no evidence that the parties were aware of, or agreed to participate in, a larger conspiracy." United States v. Medina, 944 F.2d 60, 65 (2d Cir.1991) (citing among others Meyers, 646 F.2d at 1145), cert. denied, 112 S.Ct. 1508 (1992). However, a trier of fact may infer that the participants knew of and formed the intent to promote a conspiracy when the circumstances at issue do not resemble the mere purchase and sale of drugs for personal consumption. Examples include situations where the amounts of the controlled substance involved are of wholesale proportions, id., or where the participants had an interest in the success of the conspiracy, United States v. Townsend, 924 F.2d 1385, 1397 (7th Cir.1991).
 
 
 18
 In support of his argument that the buyer-seller exception is applicable here, defendant notes that only two transactions existed between Dabney and defendant. From this fact, defendant suggests that the two could not have agreed to participate in a conspiracy. However, even as defendant appears to admit, see Appellant's Brief 20, it is not the number of transactions that determines whether purchase and sale was of the type necessary to support a conspiracy conviction but rather the nature of those transactions. Two factors in particular reveal that the two sales in this case were not of the simple buyer-seller type. First, the quantities involved, one-half kilogram for the first sale and one kilogram for the second, did not involve small amounts ordinarily used for personal consumption. Second, only approximately seven days separated the two sales. Given that short time span, a trier of fact could have inferred that Dabney was not using the drugs for personal use but, in fact, was using them for resale. The evidence presented also established that defendant had an interest in the success of the conspiracy. This was evident by the fact that defendant extended credit to Dabney and that defendant gave Dabney the one kilogram on a consignment basis. Thus, because no error occurred, we need not consider the remaining factors under Olano.
 
 B.
 
 19
 Defendant Stanfield argues that the government engaged in prosecutorial misconduct that warrants reversal of his conviction. He cites three specific situations which he asserts are misconduct: (1) the prosecutor improperly vouched for and bolstered the testimony of Dabney, (2) the prosecutor improperly commented on defendant's failure to take the stand or present an affirmative case, and (3) the prosecutor improperly referred to defendant's economic status and life style.
 
 
 20
 "Prosecutorial misconduct warrants reversal of a conviction only if it 'permeates the entire atmosphere of the trial.' " United States v. Dandy, 998 F.2d 1344, 1352 (6th Cir.1993) (quoting United States v. Cummins, 969 F.2d 223, 227 (6th Cir.1992)). Thus, "[c]ourts are generally reluctant to find reversible error unless the prosecutorial misconduct was egregious, continuous, and uncorrected by judicial intervention." United States v. Morrow, 977 F.2d 222, 229 (6th Cir.1992), cert. denied, 113 S.Ct. 2969 (1993). In assessing claims for alleged misconduct, we review the record as a whole. Dandy, 998 F.2d at 1352 (citing United States v. Solivan, 937 F.2d 1146, 1155 (6th Cir.1991)). "Factors to consider are the strength of the evidence against the defendant, the potential for prejudice to the defendant, and the timing and firmness of the district court admonition, if any." Id. (citing Cummins, 969 F.2d at 227 and Solivan, 937 F.2d at 1157).
 
 
 21
 (1)
 
 
 22
 Before the government gave its opening statement to the jury, defendant requested the district court to prohibit the admission of the plea agreement entered between the government and Dabney and the agreement entered between the government and Dabney on August 27, 1992. According to defendant's brief on appeal, defendant requested the district court in the alternative to redact those portions of the agreements which referred to Dabney's obligation to tell the truth. The district court refused to comply with either request, concluding that "in this instance it's a better course to allow the jury to see everything that pertains to the agreement between Mr. Dabney and the government and then allow the jury to make its own assessment of the credibility of the witness based on a full understanding of what the agreement is." J.A. 119-120. Subsequently, during opening arguments, the prosecution referred to Dabney's obligations under the two agreements and also the agreement entered into on August 25, 1992, stating at one point: "Dabney had to agree and has agreed to cooperate with authorities to provide truthful information about everything he knows about the cocaine trade...." J.A. 124. Then, during Dabney's testimony on direct examination, the prosecution questioned Dabney at length regarding his understanding of the three agreements. For example, a typical question asked by the prosecution was: "Is it your understanding that you have to tell the truth and nothing but the truth ... no matter who asks the questions, whether it's the prosecutor, a judge, or a defense attorney at a trial. Is that your understanding," J.A. 142. In response, Dabney responded, "Yes." Id.
 
 
 23
 During closing arguments, the prosecution again referred to Dabney's obligation under the agreements to tell the truth. Also during closing arguments, the prosecution argued that Dabney was telling the truth, in part because he faced dire consequences if he did not. For example, the prosecution stated at one point:
 
 
 24
 Tyrone did get a plea agreement to testify. Now, the defendants claim that his plea agreement provides the reason for him to lie, and I would suggest that the opposite is true. You saw Tyrone on the witness stand. That was a man that was terrified of lying. He would backpedal only to the extent that he would say, I don't want to be perceived as having lied to you for any reason. See, a lie by Tyrone Dabney carries a life sentence. Lying on the witness stand is wrong and it can get a person in trouble. It could get a person sent to prison, but not for life, but that's exactly what Tyrone faces if he lies.
 
 
 25
 J.A. 301. At another point, the prosecution stated:
 
 
 26
 Why is Tyrone afraid to lie? Well, you heard him and you heard his agreement. Lying on the witness stand will cause him to be prosecuted in state court, be prosecuted in federal court, and he could be prosecuted for all of the federal charges that are out there, all his tax charges and everything else.
 
 
 27
 J.A. 303. Near the end of his argument to the jury the prosecutor also stated, "Clearly the evidence in this case shows that Tyrone Dabney was telling the truth. You should believe him. He can't afford to lie." J.A. 338.
 
 
 28
 On appeal, defendant argues that the prosecutor's conduct constituted reversible error.[2] While he acknowledges that the prosecution is entitled to introduce a plea agreement and elicit testimony about the witness' understanding of the agreement, he argues that in this case the prosecution impermissibly overemphasized Dabney's obligations under the plea agreement to tell the truth. We review defendant's argument only for plain error in light of his failure to raise this issue before the trial court. United States v. Causey, 834 F.2d 1277, 1284 (6th Cir.1987), cert. denied, 486 U.S. 1034 (1988).
 
 
 29
 Viewing the record as a whole, we conclude that no error occurred by the prosecution's repeated reference to Dabney's obligation to tell the truth. The prosecution was certainly entitled to offer the plea agreement and the other two agreements into evidence during Dabney's testimony. United States v. Walker, 871 F.2d 1298, 1303 (6th Cir.1989) (plea agreement admissible). The prosecution was also entitled to question Dabney as to his understanding of the agreements. United States v. Frost, 914 F.2d 756, 767 (6th Cir.1990) ("A witness' understanding of his plea agreement is appropriate for the prosecution to bring out on direct examination."). The majority of the prosecutor's statements defendant finds objectionable were made during the prosecution's inquiry of Dabney on direct examination in which the prosecution merely sought to elicit what Dabney understood regarding the three agreements. The remaining statements made by the prosecution were stated during opening and closing arguments and solely suggested to the jury that Dabney was telling the truth. In light of the context in which these statements were made, no jury could reasonably believe that the prosecutor was indicating a personal belief in Dabney's credibility. Causey, 834 F.2d at 1283. Thus, none of the prosecution's statements were unfairly prejudicial. Cf. United States v. Kerr, 981 F.2d 1050, 1052-54 (9th Cir.1992) (plain error found where prosecution injected personal belief as to witness' veracity).
 
 
 30
 Moreover, we note that any possible prejudice that might have occurred by the prosecution's statements were mitigated by the following instruction given to the jury:
 
 
 31
 You have heard the testimony of Tyrone Dabney. You have also heard that the government has promised him that he will not be prosecuted in state court for the offenses described in the indictment or other federal offenses and that the government will seek to have his sentence reduced in exchange for his testimony against these defendants and his testimony in other cases.
 
 
 32
 It is permissible for the government to make such promises, but you should consider Mr. Dabney's testimony with more caution than the testimony of other witnesses. Consider whether his testimony may have been influenced by the government's promises. Do not convict the defendants based on the unsupported testimony of such a witness, standing alone, unless you believe his testimony beyond a reasonable doubt.
 
 
 33
 J.A. 344-45. The fact that an instruction was given distinguishes this case from that in United States v. Little Boy, 578 F.2d 211, 213 (8th Cir.1978) (per curiam), a case on which defendant relies. Given the introduction of the full contents of the agreements, the testimony of Dabney regarding his understanding of these agreements and the district court's instructions, the jury was able "to consider fully the possible conflicting motivations underlying the witness' testimony and, thus, [was able] to more accurately assess the witness' credibility." United States v. Townsend, 796 F.2d 158, 163 (6th Cir.1986). Consequently, we conclude that no error occurred. Thus, our inquiry under plain error review need not go further. Olano, 113 S.Ct. at 1776-79.
 
 
 34
 (2)
 
 
 35
 In Griffin v. California, 380 U.S. 609, 615 (1965), the United States Supreme Court stated that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Relying on this principle, defendant argues for the first time on appeal that on three separate occasions the prosecution made comments that violated the rule in Griffin.[3] Because none of the comments can be construed as either an indirect or direct comment by the prosecution on the defendant's failure to testify, see United States v. Moore, 917 F.2d 215, 224 (6th Cir.1990), cert. denied, 111 S.Ct. 1590 (1991), we conclude that the comments did not constitute error.
 
 
 36
 The first instance cited by defendant is the prosecution's statement during closing argument that "[defendant] lied when he told the owner of the condo that he was living there with his father." J.A. 334. This remark stemmed from the conflicting testimony at trial as to whether defendant lived with his father. A government witness testified on cross-examination that Mr. Larry Glasscoe and defendant signed a lease agreement for a condominium, identifying themselves as father and son. Later, another prosecution witness testified that at the time defendant was brought to the police station after his arrest, defendant indicated that his father's name was Leon Stanfield. While the prosecutor's statement that defendant lied may not have been proper, that statement in no way resembled the impermissible comments found violative in Griffin.
 
 
 37
 The second instance cited by defendant is the prosecution's statements during closing argument that Dabney was a drug dealer who had turned on drug dealers, that defendant was the best witness against himself because of his statements on the tapes, that defendant worked hard to convict himself, and that defendant was an accomplished drug dealer. Here again, the prosecutor's statements did not imply that defendant was guilty by virtue of his failure to testify.
 
 
 38
 The third instance cited by defendant consists of the following comments by the prosecutor during closing argument:
 
 
 39
 Now, you know, despite 45 minutes of argument by [defendant's attorney], two days of trial, [defendant's attorney] could offer no other explanation or arguments, nothing other than cocaine, whether supported by the evidence or not supported, whether even a flimsy explanation as to the circumstances surrounding his client's possession of $28,000. There is no other reasonable explanation, and he knows it, and you know it too. The only reason he got the money was because it was payment for cocaine. The only credible explanation is the obvious, and that is that it was the culmination of a drug deal, and that was known to [defendant]. No evidence otherwise.
 
 
 40
 J.A. 334. Contrary to defendant's suggestion, we neither consider these comments as "an improper commentary upon [defendant's] failure to present a defense," nor do we believe "that the prosecutor had shifted the burden to the defense by arguing that [defendant's] failure to affirmatively explain the $28,000 required his conviction." Reply Brief 19. Like the other two instances defendant cites, the prosecution in this instance made no mention, nor did he imply, that defendant's failure to testify indicated that defendant was guilty. Accordingly, because no error occurred, we need not pursue further inquiry under plain error review.
 
 
 41
 (3)
 
 
 42
 Defendant Stanfield argues for the first time on appeal that the government made the following improper references to defendant's economic status and life style: (1) the prosecutor stated during his opening statement that defendant was unemployed; (2) during the redirect examination of Dabney, the prosecutor asked whether defendant had a job; (3) during the examination of a police officer who participated in defendant's arrest, the prosecutor elicited from the witness that defendant was unemployed and that defendant possessed a beeper at the time of arrest; (4) during the testimony of another law enforcement officer, the prosecutor elicited from the witness that individuals involved in the drug business communicate by beepers, among other things; (5) during the testimony of another government witness, it was revealed that defendant operated two residences; (6) the prosecutor introduced life style evidence by calling an employee of PageNet, a company which sells and leases beepers; (7) the prosecutor called a City of Detroit police officer to testify about beepers and employment status; and (8) during closing argument, the prosecutor emphasized defendant's economic status and argued that his economic situation supported a guilty verdict. Defendant argues that "these references were an improper attempt to inflame the jury and to obtain his conviction because he was a young, unemployed African American man who carried a beeper and whose name appeared on two different leases." Reply Brief 19-20.
 
 
 43
 Under the Federal Rules of Evidence, testimony is admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. An exception to this rule is set forth in Fed.R.Evid. 403:
 
 
 44
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 
 
 45
 The determination to admit relevant but potentially prejudicial evidence is within the sound discretion of the district court. United States v. Zipkin, 729 F.2d 384, 389 (6th Cir.1984). Thus, ordinarily our review of a district court's decision is under an abuse of discretion standard, wherein we give " 'the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.' " United States v. Moore, 917 F.2d 215, 233 (6th Cir.1990) (quoting 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence p 403 (1982)), cert. denied, 111 S.Ct. 1590 (1991). However, where, as here, the defendant has failed to object to the admission of the testimony at trial, we review only for plain error.
 
 
 46
 Based on our review of the record, we conclude that no error occurred by the admission of the testimony to which defendant objects. At the time of arrest, defendant was in possession of a beeper. Testimony revealed at trial that a beeper is a common item used by individuals involved in the drug business. The fact that defendant possessed a beeper was particularly probative in this case because during the sting operation, law enforcement officials reached defendant through that instrument. Thus, the admission of evidence regarding defendant's possession and use of a beeper was proper.
 
 
 47
 The admission of evidence regarding defendant's economic status also was not erroneous. The presence of unexplained wealth can be relevant to show involvement in a conspiracy so long as it is also shown that those possessions were not derived from legitimate sources. United States v. Terzado-Madruga, 897 F.2d 1099, 1120 (11th Cir.1990) (citing United States v. Dazzo, 672 F.2d 284, 289 (2d Cir.), cert. denied, 459 U.S. 836 (1982)). Here, the prosecution attempted to show that although defendant was unemployed, he still maintained two residences. Thus, the government in this case did not rely solely on the fact that defendant was in possession of certain assets, but rather attempted to show that these assets were not obtained through lawful means. Accordingly, contrary to defendant's position, defendant's employment status and life style were relevant to the drug charges.
 
 C.
 
 48
 At the sentencing hearing, the parties disputed the amount of cocaine for which defendant was to be held accountable. Defendant Stanfield contended that he should be accountable for one and one-half kilograms of cocaine, whereas the government argued that he should be accountable for two and one-half kilograms. If the defendant's view had been accepted, the base offense level for defendant under the Guidelines would have been 26. However, under the government's view, defendant's base offense level would have been 28.
 
 
 49
 The dispute between the parties revolved around the meaning of a telephone conversation between Dabney and defendant, which occurred during the sting operation. The relevant portions of the conversation are as follows:
 
 
 50
 Dabney: I want to do it again.
 
 
 51
 Defendant: Uh, I'm gonna have to wait a while, so I can, get it.
 
 
 52
 Dabney: Oh, really?
 
 
 53
 Defendant: Yeah, I'm gonna need that so I can get it, you know.
 
 
 54
 Dabney: Oh, you need that change so you can get it. Okay, listen I gotta go out here, because I gotta go out talk to the bank about a couple of closings on these houses. So what I do is when I get you wanna just meet me at my office?
 
 
 55
 Defendant: Okay.
 
 
 56
 J.A. 65.
 
 
 57
 In the government's view, Dabney's statement that "I want to do it again," indicated that he wanted to purchase another kilogram of cocaine and defendant's statement that "I'm gonna need that so I can get it" indicated that defendant was willing to supply Dabney the additional kilogram of cocaine once Dabney delivered the money for the first kilogram. Based on that interpretation, the government argued to the district court that defendant intended to produce and was reasonably capable of producing an additional kilogram of cocaine to Dabney and thus that the additional kilogram should be included in the calculation of defendant's base offense level as relevant conduct. The district court agreed and concluded that defendant's base offense level was 28.
 
 
 58
 On appeal, defendant argues that there was insufficient evidence to establish that defendant intended to produce an additional kilogram of cocaine to Dabney. He argues that the meaning of the conversation between Dabney and defendant is unclear, suggesting that when defendant stated "I'm gonna need that so I can get it," he might have been simply trying to stall Dabney in order to collect the payment for the delivery of the first kilogram.
 
 
 59
 A district court's decision regarding the quantity of a controlled substance for which a defendant is to be held accountable is a finding of fact based upon a preponderance of the evidence, and, thus, we must accept that finding unless it is clearly erroneous. United States v. Warner, 971 F.2d 1189, 1200 (6th Cir.1992). " ' "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." ' " United States v. Perez, 871 F.2d 45, 48 (6th Cir.) (quoting Archer v. Macomb County Bank, 853 F.2d 497, 499 (6th Cir.1988) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573 (1985))), cert. denied, 492 U.S. 910 (1989).
 
 
 60
 We conclude that the district court's determination is not clearly erroneous. Dabney testified at trial that when he stated "I want to do it again," he meant that he wanted to purchase another kilogram of cocaine. Based on defendant's immediate response that, "I'm gonna have to wait a while, so I can, get it," it is reasonable to conclude that not only did defendant understand that Dabney wanted to purchase cocaine, but also that Dabney wanted to purchase another kilogram of cocaine. This is true particularly in light of the fact that Dabney had just recently purchased a kilogram of cocaine from defendant and that the conversation between Dabney and defendant referred to the payment for that kilogram. Given the circumstances surrounding the conversation, we cannot conclude with any definite and firm conviction that a mistake was made in the district court's determination. Thus, we will not disturb the district court's finding.
 
 D.
 
 61
 At the sentencing hearing, the district court considered defendant's agreement with Dabney on August 26, 1992, to sell one kilogram of cocaine as relevant conduct under the Guidelines. On appeal, defendant argues that his agreement with Dabney could not be considered relevant conduct because at the time of the agreement Dabney was acting as a government informer, and thus any agreement he reached with Dabney at that time could not form the basis of a conspiracy.
 
 
 62
 Section 1B1.3 of the Guidelines, the relevant conduct provision, sets forth factors a sentencing court is to consider in determining a defendant's base offense level. Where the Guidelines provide more than one base offense level for a particular crime, such as where there are numerous base offense levels for the crime of conspiracy, the district court is to consider:
 
 
 63
 (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant;
 
 
 64
 * * *
 
 
 65
 * * *
 
 
 66
 that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense....
 
 
 67
 Sec. 1B1.3(a)(1)(A). "In order to comport with due process requirements, ... proof of the relevant conduct should be 'supported by "some minimal indicium of reliability beyond mere allegation." ' " United States v. Kappes, 936 F.2d 227, 229 (6th Cir.1991) (quoting United States v. Smith, 887 F.2d 104, 109 (6th Cir.1989) (quoting United States v. Baylin, 696 F.2d 1030, 1040 (3d Cir.1981))). "We review a district court's determination that conduct is relevant to the offense of conviction for clear error." United States v. Nichols, 979 F.2d 402, 413 (6th Cir.1992) (citing United States v. Silverman, 889 F.2d 1531, 1539 (6th Cir.1989)), cert. granted in part, 114 S.Ct. 39 (1993).
 
 
 68
 Defendant essentially argues that his act, the alleged agreement with Dabney to sell one kilogram of cocaine, was not committed during the commission of the conspiracy, and thus did not constitute relevant conduct, because at the time of the alleged agreement there was no longer a conspiracy between defendant and Dabney due to Dabney's status as a government informer. Had the scope of the conspiracy in this case been limited to a conspiracy between Dabney and defendant, defendant might be correct. "[T]he formal requirement of conspiracy is not met unless an individual conspires with at least one bona fide coconspirator." United States v. Medina, 992 F.2d 573, 582 (6th Cir.1993) (citing United States v. de Bright, 742 F.2d 1196, 1199 (9th Cir.1984)). Because a person acting as a government informer is not a bona fide coconspirator, United States v. Nunez, 889 F.2d 1564, 1569 (6th Cir.1989); United States v. Scaife, 749 F.2d 338, 346 n. 9 (6th Cir.1984), the agreement reached by defendant and Dabney during the time Dabney acted as a government informer could not by itself form the basis of a conspiracy. United States v. Barboa, 777 F.2d 1420, 1422 (10th Cir.1985) ("[T]here can be no indictable conspiracy involving only the defendant and government agents or informers.").
 
 
 69
 We will not, however, construe narrowly the scope of the conspiracy as suggested by defendant. The indictment at issue here did not just allege a conspiracy between Dabney and defendant, but rather charged that defendant "knowingly, willfully and unlawfully combine[d], conspire[d], confederate[d] and agree[d] ... with Tyrone Dabney and other persons, both known and unknown to the Grand Jury." J.A. 19 (emphasis added). At trial, while the bulk of the government's evidence concerned defendant's agreements with Dabney, there was evidence to support a finding that defendant agreed with at least one other person to distribute and possess with intent to distribute cocaine. For example, when Dabney sought to purchase another kilogram of cocaine from defendant, defendant stated: "Uh, I'm gonna have to wait a while, so I can, get it.... I'm gonna need [payment for the first kilogram] so I can get it, you know." J.A. 65 (emphasis added). Given these statements, it is reasonable to conclude that although defendant did not have the cocaine readily available, he could obtain it if he were given time and money. We have previously held that statements made by a defendant before or during the commission of a crime, such as in this case, are more reliable than statements made after the crime has been committed. United States v. Pennell, 737 F.2d 521, 536-37 (6th Cir.1984), cert. denied, 469 F.2d 1158 (1985).
 
 
 70
 Consequently, we conclude that it was not clearly erroneous for the district court to view defendant's agreement with Dabney on August 26, 1992, as relevant conduct. At that time, defendant's act of agreeing to sell Dabney one kilogram of cocaine was committed during the commission of the conspiracy between defendant and another person. The fact that the other person has not been identified or even charged by name does not undermine the conclusion that defendant was engaged in a conspiracy with that person to distribute cocaine. Id. at 537. Thus, because defendant was involved in a conspiracy with someone other than Dabney on August 26, 1992, and defendant's agreement to sell Dabney the kilogram of cocaine occurred during the commission of that conspiracy, defendant's agreement was properly considered as relevant conduct for sentencing purposes.
 
 E.
 
 71
 Defendant argues that the government manipulated his sentence which rendered his sentence fundamentally unfair. According to defendant, the government pressured Dabney to purchase another kilogram of cocaine from defendant for the sole purpose of holding defendant accountable for a greater amount of drugs.
 
 
 72
 Defendant failed to raise this argument before the district court, and thus our review is solely to determine whether the district court's inclusion of the additional kilogram of cocaine was plain error. Under that standard, we conclude that it was not. The government may seek to induce a defendant to repeat or continue a crime or even to induce a defendant to extend previous criminal activity. United States v. Mosley, 965 F.2d 906, 912 (10th Cir.1992). However, the government may not manipulate a transaction with a defendant in order to increase the severity for purposes of sentencing. United States v. Sivils, 960 F.2d 587, 598 (6th Cir.) ("If [defendant] could demonstrate that the government manipulated the dollar amount of cocaine to increase his sentence, such manipulation would certainly provide a fundamental unfairness defense against the higher sentence."), cert. denied, 113 S.Ct. 130 (1992). Other than the conclusory statement that the government instructed Dabney to purchase another kilogram of cocaine from him in order to "rachet up [his] sentence," Appellant's Brief 41, defendant fails to provide any evidence to support his position. Because defendant bears the burden to demonstrate government manipulation, he has failed to show any prejudice. Accordingly, we conclude that no error occurred.
 
 F.
 
 73
 Pursuant to the Guidelines, a defendant's criminal history category is based in part upon prior sentences served by the defendant. U.S.S.G. Sec. 4A1.1. In this case, the district court based defendant's criminal history category upon a sentence defendant served for a prior state conviction of possession with intent to use cocaine. As a result of including that conviction, the district court assigned defendant to criminal history category II. On appeal, defendant argues that the district court erred, contending that this sentence falls within either of two exceptions created by the Guidelines. Had the district court not included his drug conviction in the computation of his criminal history category, defendant argues, he would have been assigned to criminal history category I.
 
 
 74
 The facts surrounding defendant's state conviction, which are set forth in the presentence investigation report, are as follows. Defendant was stopped for speeding by Lansing Police Department officers. Upon a search of defendant's car, the police officials found a prescription-type bottle containing a small amount of white powder, which was later identified as cocaine. Defendant was subsequently charged with possession of less than 25 grams of cocaine and with possession with intent to use cocaine. On November 22, 1989, defendant pled guilty to the latter charge, and the first charge was dismissed. On January 2, 1990, he was granted consideration under Mich.Comp.Laws Ann. Sec. 333.7411 (West 1992), which provides as follows:
 
 
 75
 When an individual who has not previously been convicted of an offense under this article or under any statute of the United States or of any state relating to narcotic drugs, coca leaves, marihuana, or stimulant, depressant, or hallucinogenic drugs, pleads guilty to or is found guilty of possession of a controlled substance under section 7403(2)(a)(v), 7403(2)(b), (c), or (d), or of use of a controlled substance under section 7404, or possession or use of an imitation controlled substance under section 7341 for a second time, the court, without entering a judgment of guilt with the consent of the accused, may defer further proceedings and place the individual on probation upon terms and conditions. Upon violation of a term or condition, the court may enter an adjudication of guilt and proceed as otherwise provided. Upon fulfillment of the terms and conditions, the court shall discharge the individual and dismiss the proceedings. Discharge and dismissal under this section shall be without adjudication of guilt and is not a conviction for purposes of this section or for purposes of disqualifications or disabilities imposed by law upon a conviction of a crime.... There may be only 1 discharge and dismissal under this section as to an individual. The records and identifications division of the department of state police shall retain a nonpublic record of an arrest and discharge or dismissal under this section.
 
 
 76
 (footnotes omitted). As part of being granted consideration under Sec. 333.7411, defendant was sentenced to six months probation and assessed $100 in fines and costs and $90 in overnight fees. He was also required to graduate from high school or obtain a GED and to attend counseling.
 
 
 77
 On July 20, 1990, defendant was found to have violated the probation conditions by failing to pay a portion of his overnight fee charge, by failing to get an education, and by failing to attend counseling. Ten days later, he was arraigned, where he pled not guilty. Then on September 10, 1990, defendant paid the overnight fee and pled guilty to the other probation violations. His probation was extended 60 days, and he was ordered to serve 20 days in jail, having received credit for five days. Moreover, he was ordered to obtain a GED and to attend counseling. On February 14, 1991, defendant was discharged satisfactorily.
 
 
 78
 Whether defendant's sentence for possession with intent to use cocaine may be used in the calculation of his criminal history category under the Guidelines is a question of law. Thus, we review the district court's decision de novo. United States v. Rockman, 993 F.2d 811, 812 (11th Cir.1993). Although the Guidelines provide as a general rule that sentences for all felony offenses are to be used for the computation of a defendant's criminal history category, U.S.S.G. Sec. 4A1.2(c), certain sentences are not to be considered. Defendant relies on two of these exceptions; namely, Sec. 4A1.2(f), which excepts diversions from the judicial process without a finding of guilt, and Sec. 4A1.2(j), which excepts sentences for expunged convictions.
 
 Section 4A1.2(f) provides as follows:
 
 79
 Diversion from the judicial process without a finding of guilt (e.g., deferred prosecution) is not counted. A diversionary disposition resulting from a finding or admission of guilt, or a plea of nolo contendere, in a judicial proceeding is counted as a sentence under Sec. 4A1.1(c) even if a conviction is not formally entered, except that diversion for juvenile court is not counted.
 
 
 80
 As explained in the application notes, Sec. 4A1.2(f) "reflects a policy that defendants who receive the benefit of a rehabilitative sentence and continue to commit crimes should not be treated with further leniency." U.S.S.G. Sec. 4A1.2, comment. (n. 9).
 
 
 81
 Based on the plain meaning of the guideline, we conclude that the defendant's sentence does not fall within the exception under Sec. 4A1.2(f). In the state case, defendant pled guilty to the charge of possession with intent to use cocaine. On the basis of that plea, he was sentenced to probation, among other things. Although the proceedings with respect to that plea might have been later dismissed without adjudication of guilt under Mich.Comp.Laws Ann. Sec. 333.7411 (West 1992), defendant was not eligible for consideration under the Michigan statute unless he first made an admission of guilt. See United States v. Hawkins, 969 F.2d 169, 173 (6th Cir.1992) ("By its terms, M.C.L. Sec. 333.7411 only applies when an individual 'pleads guilty to or is found guilty of specified statutes banning drug possession and use."), cert. denied, 113 S.Ct. 1021 (1993). That admission is all that is required under the Guidelines for his sentence to be counted towards the determination of his criminal history category. United States v. Stowe, 989 F.2d 261, 263 (7th Cir.1993) (defendant's plea of guilty and subsequent placement on court supervision sufficient for sentence to fall within scope of Sec. 4A1.2(f) despite fact that conviction was later set aside under state law).
 
 
 82
 In the alternative, defendant argues that the sentence he served for his conviction of possession with intent to use cocaine should not be used to determine his criminal history category because pursuant to Sec. 333.7411, that conviction was expunged upon his discharge. Sentences for expunged convictions are not to be considered in determining a defendant's criminal history category. U.S.S.G. Sec. 4A1.2(j). However, sentences for convictions that have later been set aside are to be considered. The Sentencing Commission elaborated on this distinction in a commentary note:
 
 
 83
 Convictions Set Aside or Defendant Pardoned. A number of jurisdictions have various procedures pursuant to which previous convictions may be set aside or the defendant may be pardoned for reasons unrelated to innocence or errors of law, e.g., in order to restore civil rights or to remove the stigma associated with a criminal conviction. Sentences resulting from such convictions are to be counted. However, expunged convictions are not to be counted.
 
 
 84
 U.S.S.G. Sec. 4A1.2, comment. (n. 10). Thus, as explained by the comment, "convictions excluded from the criminal history calculation are those in which the defendant was subsequently found innocent or which involved legal error. These convictions are classified as 'expunged.' " United States v. McDonald, 991 F.2d 866, 871 (D.C.Cir.1993).
 
 
 85
 We conclude that defendant's conviction was not expunged under Sec. 333.7411 but rather was set aside. Section Sec. 333.7411 provides that upon the fulfillment of the terms and conditions of the probation, "the court shall discharge the individual and dismiss the proceedings. Discharge and dismissal under this section shall be without adjudication of guilt and is not a conviction for purposes of this section or for purposes of disqualifications or disabilities imposed by law upon a conviction of a crime...." Thus, under the terms of Sec. 333.7411, a court is required to discharge a defendant and dismiss the proceedings against him, not because defendant was subsequently found innocent or because of a legal error, but because the defendant satisfactorily fulfilled the conditions of the probation.
 
 
 86
 Additionally, had the Michigan legislature intended Sec. 333.7411 to expunge a defendant's conviction upon the fulfillment of the terms of the probation, it could have expressly provided so. See Mich.Comp.Laws Ann. Sec. 791.235(1)(a) (West 1982 & 1993 Supp.) (in making a parole determination, parole board shall not consider "[a] juvenile record that a court has ordered the department to expunge"); Mich.Comp.Laws Ann. Sec. 750.224f (West 1991 & 1993 Supp.) (statute prohibiting convicted felon from possessing firearm does not apply to a conviction that has been expunged). The absence of such an express provision provides persuasive evidence that Sec. 333.7411 was not meant to expunge convictions. See United States v. Beaulieau, 959 F.2d 375, 380-81 (2d Cir.1992) (Vermont statute, which provided that once the record of a prior juvenile conviction is sealed, the proceedings shall be considered never to have occurred, found to expunge prior conviction); United States v. Kammerdiener, 945 F.2d 300, 301 (9th Cir.1991) (federal statute, which automatically set aside a youth conviction upon unconditional discharge, found to expunge prior conviction); United States v. Johnson, 941 F.2d 1102, 1112 (10th Cir.1991) (Oklahoma statute, which provided that upon completion of probation term defendant shall be discharged without a court judgment of guilt and the verdict shall be expunged from the record, found to automatically expunge prior criminal record). Accordingly, we conclude that the district court did not err in including defendant's prior conviction for possession with intent to use cocaine in calculating defendant's criminal history category.
 
 III.
 
 87
 For the reasons stated, the judgment of the district court is AFFIRMED in all respects.
 
 
 
 *
 Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Although a government informant cannot conspire with a defendant to form a criminal conspiracy, see United States v. Pennell, 737 F.2d 521, 536 (6th Cir.1984), cert. denied, 469 U.S. 1158 (1985), the conspiracy alleged here involved individuals in addition to Tyrone Dabney and defendant, and between August 17, 1992, and August 24, 1992, Tyrone Dabney clearly was not acting as a government informant
 
 
 [2]
 The objections made by defendant prior to trial revolved around the admission of the agreements. Defendant failed to object to the prosecutor's statements at issue here
 
 
 [3]
 Defendant also cites the testimony of a government witness who had sold the beeper to defendant. Defendant argues that the testimony of this witness was used to imply that defendant wanted to conceal his possession of the beeper. Defendant fails to explain, however, how this testimony raises the implication set forth in Griffin